This is International Eyecare Center v. Daniel L. Hayden. For the appellant, we have Bruce Sendek, and for the appellee, Brett Gorman and Christopher Lyle. Will you both be arguing? Yes, ma'am. Have you split your time? I'm sorry. No, I will. I'm sorry, you will. There are two of us. Yes. I will be arguing. All right. This is 4090945. Please proceed. May it please the Court, I am Bruce Sendek, and I represent International Eyecare Center. The point I'd like to first address is what I believe is a fundamental mistake made by the lower court that resulted in IEC's request for an injunction being denied. And the fundamental mistake related to the 2009 contract signed between IEC and Dr. Hayden. It was a valid contract. It met all of the basic fundamental requirements of a contract. There was bargain for consideration, consideration being either promises or performance going in either direction. It had assent. It was signed by Dr. Hayden in February of 2009. It met every basic requirement of contract. The judge voided that contract. He determined that it would not, it did not by application of two principles. One was the idea of pre-existing duty, and the other one was application of legal doctrines pertaining to non-compete agreements that deal with at The judge determined, the lower court determined, that there was not, there was a pre-existing duty that IEC and Hayden, Dr. Hayden, had an agreement in 2001, and that the new agreement didn't change things sufficiently. But, in fact, there was on the record, not contradicted, unrefuted evidence that there were substantial considerations going both ways. And the test for pre-existing duty is a narrow one. We have cited Corbin, which is basic tenant of contracts, and it's followed in this state, and is that it is enough to have a new agreement that is enforceable, even though there may have been a prior one, if there's some small additional performance bargained for and given. That's the law. In response, Applee cite cases where there was no additional obligation. Cases such as a real estate broker who was already committed by contract to return a deposit. No additional consideration was needed. The existing agreement was enforceable, and the subsequent agreement was not because of the pre-existing duty rule. The other mistake that was made is that when the court below looked at the question of consideration, it focused on a series of cases that dealt with at-will employees who already had an employment agreement in place, or, sorry, didn't have an employment agreement in place because they were at-will. But they were employed and then And in those cases, such as Brown v. Brown, the courts look to consideration for that covenant, the covenant not to compete. And in cases such as Brown v. Brown, the courts have said generally that you need at least two years of additional employment to support a non-compete in a situation where you have an existing employee who's at-will. And from that body of case law, the lower court started looking at the adequacy of consideration, started to interpret what the 2009 contract said, and analyzed whether or not the consideration was sufficient when weighed against the Brown v. Brown type analysis. And that's not the law. And in fact, the consideration that was demonstrated at trial does go both ways, is adequate. So, for example, we have a 2001 contract, which was the one before the 2009 contract. It is going to be renewed throughout the years until you get to 2009. In that contract, the base salary was in the neighborhood of $82,000. In 2009, after negotiations and bargaining, Dr. Hayden and IEC reached $110,000 as the base salary going forward. There was a great deal of bargaining and negotiation over a new bonus structure that would be In 2001, it was premised on a gross number in terms of what the bonus would be calculated at. After a certain threshold had been reached by Dr. Hayden, the new agreement was premised on a net number. And that net number was without any threshold first being achieved. Entirely different, new considerations, new form of agreement. Bargained for. Dr. Hayden came back to IEC and said that he wanted to make sure that there was some sort of floor, limit, on what the company could charge by way of corporate overhead. They negotiated it, and it's in the contract. Can't be more than 15%. They negotiated in 2009 the terms of vacation policy. It had been unstated that there was no guaranteed vacation. In 2009, Dr. Hayden wanted a guaranteed vacation. He wanted four weeks guaranteed vacation. They settled on three. All the hallmarks of bargain for exchanges. Mutual obligations. And, in addition, there was a payment of $67,000 that was made by IEC to Dr. Hayden, conditioned on signing the new agreement. It was a discretionary bonus that IEC had the right to pay or not pay, and they agreed to pay it, provided he agreed to the new agreement. Dr. Hayden signed the agreement, and the parties moved forward with that agreement for the next nine months. It was effective January 1, signed February, until Dr. Hayden resigned in October. During that entire period of time, Dr. Hayden was paid at the new increased base rate salary, annualized at $110,000 a year. He received a bonus premised on the new formula for the first three quarters, and he received the $67,000. He received all of that, and they operated on that until he resigned. IEC then sought to enforce the non-compete, which under any standard is reasonable in this state. IEC sought to enforce the non-compete, and that is when Dr. Hayden responded with a challenge in the lower court, attacking the validity of the 2009 contract, making an argument that it was not enforceable. Again, two arguments came up. One was the pre-existing duty argument, and the other one was an argument regarding Brown v. Brown, which says in that case, an at-will employee is required to sign a non-compete agreement, gets nothing for it, and the courts have held that they will not enforce it unless there is enough continuing employment to satisfy the question of consideration. That's the cases that the lower court looked at in coming up with a determination that, in the court below's words, that the increase in base salary was a peppercorn, or less than a peppercorn, in comparison to what Dr. Hayden had in the 2001 contract. That should never have been weighed. The court should not have made that decision. It should not have looked at comparing a base salary in 2009 to 2001 to determine if the 2009 contract is enforceable. What this court should have done, what the lower court should have done, excuse me, what the lower court should have done is look to the body of case law that exists in this state that deal with medical professionals. And in those cases are very telling. They start with the case of Bauer in 1956. They move on up to, all the way to Mahanty in, I think it's 2007. And each one of those cases, including this court's case in, sorry, the Prairie case, including this court's decision in Prairie, Prairie I, all recognize that professionals, sophisticated people, have the right to bargain. And they should be able to bargain. And they should be able to reach their own terms. And here they did. They came up, they bargained for a non-compete agreement, very similar to what was in place in 2001, modified in 2006, so that it provided for a 20-mile radius, three years, that had been in place in 2006. They came up with an additional modification to it in 2009. But freely bargained for and negotiated between the parties. Counsel, what's our standard of review? I believe in this situation it is de novo. I say that because the basic facts that drove the decision below are not in dispute. They're questions of law. They're questions of law in the court's interpretation of the preexisting duty rule, and the court's interpretation of what type of law applies here, whether it's the Brown and Brown standard pertaining to at-will employees, or whether it is the Mohanty standard that pertains to professionals, medical professionals, such as Dr. Hayden, in negotiating with their employers. That's the standard I believe should apply. Now, to move on, so the real dilemma comes next. After the court rejects the 2009 contract on what I believe is misapplication of some basic fundamental contract principles, the lower court, as the appellee argued, stated that, well, you don't meet the standards for getting an injunction because you haven't proved likelihood of success on the merit. The reason that argument was made is because the court below said that we now are operating under the 2001 contract. Having determined that the 2009 contract has no applicability, was void, having voided that, the court below said, well, the 2001 contract must apply. So I will turn to that. And turning to that led to a conclusion that the bonus structure paid to Dr. Hayden in 2009 hadn't been paid according to the formula that was required, required by the 2001 contract. Of course it hadn't been paid under the new formula because both parties, Dr. Hayden and IEC, were offering under the assumption, and a good one too, that the 2009 contract was in operation. So they computed the bonus structure for Dr. Hayden every quarter based on the net percentage, which did in fact have the ability to earn him more money, and as of the third quarter of 2009 in fact was better than it had been under the growth structure. But it wasn't the same structure, the same formulas required by the 2001. So naturally the parties didn't follow that. IEC paid according to the 2001 bonus structure. Dr. Hayden accepted the payments as given to him in 2009 following the net formula. Again, Dr. Hayden accepted the $67,000 payment. He accepted his increase in base as well. So all of that took place in 2009 until we get to the point where Dr. Hayden quits IEC voluntarily, leaves his employment, opens up across the street in direct contravention of the agreement, and soliciting IEC's patience, hiring away their most senior optician, direct violations, and at that point we get the challenge saying that the 2009 contract should be nullified and the court below agrees. And for those reasons, the lower court decision should be reversed, and the preliminary injunction requested by IEC should be entered. Thank you. Counsel? May it please the court. Brett Gorman for the defendant and the lead, Dr. Hayden. Your Honors, the trial court concluded below that the 2009 term sheet failed for lack of consideration because the 2001 term sheet automatically renewed for calendar year 2009 when neither party gave written notice under the contract of their intent to terminate that agreement prior to 90 days, probably August of 1998. So they couldn't renegotiate without providing the 90-day notice? They could renegotiate, but they were operating with this 2001 term sheet in the background, which had pre-existing duties in it. In other words, IEC had already committed to employ Dr. Hayden on a gross receipts formula and also with a restrictive covenant that was less burdensome than the one that was contained within the 2009 term sheet. The court examined, as the court is required to do, the adequacy of consideration to support a restrictive covenant. That requirement is not limited to employees at will, and there is no special exception that would apply within the medical context. All of those cases, Mohanty included, Mohanty doesn't address consideration specifically because it was not an issue in that case. But consideration is an issue in all contract cases, number one, and in particular, Illinois cases involving restrictive covenants. That's the lesson of the Brown case, which specifically says, in the context of post-employment restrictive covenants, Illinois courts depart from the traditional rule that the law does not inquire into the adequacy of consideration, only its existence. We raised the issue of consideration immediately upon receipt of a verified complaint seeking this preliminary injunction, and we filed a motion to dismiss, asserting that the verified complaint did not contain the factual statements that are required to support consideration. The court rejected our arguments at that point in time, finding that for pleading purposes, they had satisfied that burden. But if we look at what the consideration that was being proposed at that time is supporting the 2009 term sheet, we had an increase in the base pay from $82,550 up to $110,000. And we had a restructuring of the bonus arrangement, but it wasn't defined. And we argued to the court, I think correctly, that it was a stealth allegation. Because actually, when you look at the base pay and the bonus structure combined, we felt and continue to believe that Dr. Hayden took a pay cut in agreeing to the 2009 term sheet. The other thing that was raised at that initial hearing as consideration was a $10,000 payment that was made back in 2006 on Dr. Hayden's behalf. That was clearly stale consideration. So at that point in time, we were going forward on the idea that the consideration supporting the 2009 term sheet was limited to base pay and the restructuring of the bonus. When we got into the preliminary injunction hearing, we learned some important facts and evidence which undermined that theory. Specifically, the testimony of IEC's principal witness, Teresa Carter, and some of the documents that were admitted in evidence suggested and showed that the whole intention of IEC in seeking to renegotiate the 2009 or its 2001 term sheet was to rein in his compensation, was to scale it back. What it also showed significantly was that at the same time the total compensation was being scaled back, there was a ratcheting up, the insertion of a more burdensome restrictive covenant in that There was language taken out of the 2001 term sheet which excused Dr. Hayden's performance in the event of an IEC breach or a termination without cause. Now the important thing about that second ratcheting up provision in the restrictive covenant, it was never discussed with Dr. Hayden as part of the negotiations. That evidence was before the judge. It was just slipped in there. It wasn't bargained for. There was no exchange regarding that particular provision. It was slipped into the contract. Now Dr. Hayden was negotiating back and forth throughout this time period. Yes, he was. Was he represented by counsel? He was not. We won't even talk about whether he should have been at this point. There were changes made at his request, correct? Yes, there were. Even if his salary is cut, he's still receiving some consideration. He's still receiving some consideration, but he takes a pay cut and gets a worse contract. But that happens. That happens, but if there is a pre-existing obligation on IEC to pay him according to the 2001 term sheet, the pre-existing duty rule steps in and acts as a gatekeeping function to say you can't do that. Well, I thought the pre-existing duty rule was no longer favored in Illinois. I have not seen any citation suggesting that in any of the briefs. No, it's not. I'm sorry. I apologize. It's in other jurisdictions. There has been a long-standing debate about the pre-existing duty rule, but it is still law in the state of Illinois. And it serves an important purpose, which is to protect against basically coercion in having one party first agree to do something and then try to renegotiate the deal. It's no different than if someone shows up and agrees first to put a new roof on my house for $25,000 and I say fine. And then he gets on the job site and says, hey, I want $35,000 for this job now. That is what the pre-existing duty rule protects against, and that is what the court correctly applied in this case. I want to address the standard of review because I think it is of utmost importance in this case. And I think as a preliminary matter, I think the cases are all in line suggesting what the scope of the appellate court's review is in terms of the review of a granting or a denial of a preliminary injunction. And I've cited this in the brief from the Midtown Petroleum v. Gallen case. The sole role of an appellate court in addressing the grant or refusal to grant interlocutory decree and action for injunctive relief is restricted to a determination of whether a trial judge correctly exercised his broad discretionary powers. That is the issue that is before this court, and I think the standard of review, which is connected with this, makes sense. And that is that this should be reviewed, the consideration issue within this case should be reviewed for an abusive discretion or whether the trial court's findings are against the manifest way of the evidence. And we cited a number of cases to support that point. And I understand that there are cases that come out with the initial statement that questions of consideration are a question of law. But when you read those cases, the question of law that is decided by the courts is what is consideration? Does the pre-existing duty rule apply in the state of Illinois? Is past consideration sufficient to support a fresh promise? Those are the questions of law dealing with consideration. Those issues here on the law, I believe, are largely undisputed. The law is what it is in the state of Illinois. On the other hand, the question of fact that goes with a consideration issue is an evaluation of the quality of the consideration that is given in a particular case. And those are intensely factual findings, as the briefs show. The briefs with all of the numbers floating around and what is good and what is bad in comparison to the 2001 term sheet, that is a factual determination that the trial court made in this case. And what he looked at when he made that determination was he looked at the historical performance of IEC and applied the 2009 term sheet provision of 35% of the net revenues of IEC. He applied that to the historical performance dating all the way back. In IEC, I had Theresa Carter on the witness stand. We put the documents in front of her and we got through two years of going through this exercise showing that based upon historical performance, Dr. Hayden took a pay cut. And at that point in time, counsel for IEC stipulated that yes, if we continue to go on with this exercise, it will show that applying the 2009 term sheet to the historical data, it will confirm that Dr. Hayden took a pay cut, which is no surprise because that is what the whole intention was in trying to renegotiate the contract. And so the court, and I know in the briefs there's a lot of criticism of why should we look backwards, let's look forward. And I think the answer to that is there's no rule that says you have to look backward or you have to look forward. It's the trial court's discretion to listen to that evidence and make a determination and render a judgment and a finding based upon what he heard. And in this instance, he elected to accept our historical performance data because it was consistent with the testimony of IEC's own witness, that the idea was to scale back Dr. Hayden's compensation. And so the problem that the court found with this entire state of affairs, this 2009 term sheet, was quite simple. Dr. Hayden took a pay cut and he got stuck with a more restrictive covenant going forward in that employment relationship. And the pre-existing duty rule stands in the way and protects against that kind of conduct. And one more issue on the standard of review, because in IEC's reply brief, which obviously we haven't had a chance yet to respond to, IEC characterizes my suggestion that the de novo review standard does not apply as inaccurate and misleading. And then they go on to cite a case, an in-rate marriage of Tavison, which again starts out with this statement that consideration issues are questions of law. But just as the cases we cited, the Johnson case and the Midtown Petroleum case, after the court comes out and makes that pronouncement in in-rate Tavison, the court then goes on to define what consideration is, but then applies a factual analysis of the evidence and makes a determination that, in that case, the trial judge findings were against the manifest rate of the evidence. But still, they clearly come out and say that issue is a question of fact. So are you saying it's manifest weight or abuse of discretion, or are they the same thing anyway? That is what I'm saying. I mean, I haven't been able to find a distinction in the case law. If you read the cases, they come out and they say the court's findings were not against the manifest weight of the evidence, and there was no discretion. There's no doubt the standard has been conflated for years. I taught a course on standard of review on these injunctions, preliminary and temporary. And the best I could determine was that question of law is reviewed de novo, and that would be as to the clear right in need of protection and the likelihood of success in the merits. And then the abuse of discretion, it wouldn't be manifest weight of the evidence because there's no fact finding at this stage, would apply to the urgency, irreparable harm in the balance of the equities. What would that be in your case? Well, I disagree with the premise that likelihood of success on the merits would be a question of law. I think it's clearly in this case a question of fact that the court decided. And it applies to all of the arguments actually that IEC has presented in its appeal. The consideration issues, whether Dr. Hayden ratified the contract, and whether there was a material breach by IEC which excused Dr. Hayden's performance. I think those are all factual issues that the court is entitled to consider and make a determination exercising his discretion as to whether the case is likely to succeed on the merits. Well, I agree with you that this is an unusual posture, that more evidence was presented at this hearing than you ordinarily see in a preliminary hearing, which does appear to create questions of fact. Now, is your client claiming he did not ratify the contract? Yes, he is. And the evidence showed a number of things on the ratification issue because it is true. He continued to be employed after February 23, 2009 until he resigned on October 4, 2009. But the evidence shows a number of important factual issues related to that point. Number one, it started out there was a problem with the contract. He signed it and marked next to his name under duress. Before the contract went into effect, the pay adjustments went into effect on April 1. He corresponded with IEC and he told them this was not his agreement and he wanted to reconvene discussions about his arrangement going forward. He then continued, and the evidence is all the way from I believe May until August, there were a number of meetings where the parties got together and tried to get this worked out. And they couldn't. And so ultimately to say that he ratified the contract while at the same time he is telling them this is not my agreement, I don't agree with this. It's not my agreement because I don't want it to be my agreement, but I signed the agreement. I signed the agreement. But it isn't really what I want. That's right. He signed it and he marked it next to his name under duress. Those are the facts in front of the trial judge. And I believe the trial judge looked at those facts and looked at the ongoing course of conduct between the parties and said, at this preliminary stage, I don't see ratification on these facts. It's not there. So the signature means nothing then? Well, the signature certainly means something. Okay, what does it mean? Well, it means, it could mean a couple of things. And this is an issue we didn't get into because IEC in part was claiming at the preliminary injunction stage we were not entitled to present evidence of affirmative defenses. But we were prepared to go forward with, and we are prepared as the case remains pending, with a duress defense showing the conduct that went on between the parties leading up to the actual signing of the document. So we're not arguing duress here, obviously. But we are pointing out that evidentiary piece of the puzzle to show that there was no ratification. And that, I believe, under the cases that we cited, it's again, did the trial court abuse his discretion at this stage of the litigation in saying there is not enough here. For me, the trial judge, to put the weight of the authority of this court and its equitable jurisdiction behind a contract that shuts down a professional from applying his chosen trait. That was the court's conclusion at this point in time. And we believe, your honors, that that decision should not be disturbed. The case is still proceeding. It's ongoing. There's just no preliminary injunction in place because the plaintiff is not entitled to that form of relief. Thank you, counsel. Rebuttal? Yes, thank you. If we're going to speak of equities, the record is that IEC was founded by Dr. Jack McDougall in 1981. He built that practice from nothing, from scratch. And he went to Quincy and created a practice. Dr. Hayden came in 10 years ago, about 10 years ago. It was an established practice, a very well-thriving practice. Dr. Hayden had no clients, no patients. And so the equities definitely favor IEC, if that is even an issue. There's no question that Dr. Hayden is a sophisticated man. He is capable of negotiating his own agreement. They started negotiating this agreement in July of 2008. That's what the record shows. And the week before he signed the agreement, he sent an email, that's on the record too, to the president of IEC, Teresa Carter, and said he's gone over everything and that he's ready to sign it. And then he moved forward to February 23. And the evidence in the record is that he sat down with Teresa Carter, crossed the table, he signed the agreement. Then after he did that, he took it back, according to the testimony, uncontroverted, and said, just for fun, I want to write under duress. Whatever that meant, he did that. Nothing came of it. He never thereafter sought to rescind the agreement or do anything about it, or say that it wasn't in effect. He never refused to take his payments, base pay, bonus calculation. Counsel, did your clients continue to negotiate during this time period? They wanted to make Dr. Hayden happy. So when Dr. Hayden came back and asked for some additional benefits, he wanted to make sure that he would have at least the minimum bonus in 2009 and thereafter. So they talked to him about that. So yes, they did talk to Dr. Hayden because he was an important part of that practice, and they wanted to keep the man happy. And that's why, before he signed in February of 2003, when he asked to make sure, wisely, sophisticatedly, asked to make sure that there was a cap on what the company could charge, because it was a net calculation and bonuses, what they would charge for corporate overhead, he negotiated a 15% cap. He knew what he was doing, and they did that to keep Dr. Hayden happy. This wasn't a take it or leave it situation. Dr. Hayden didn't have to sign the 2009 contract, as you've heard. The 2001 contract was in existence until this replaced it. He did that freely and openly and willingly. Now, what we're hearing in this appeal is some sort of notion that I think was also argued to lower court and causes part of the problem, that you have to have singled out some sort of special consideration, and it has to be adequate, real adequate, very substantial, again, playing off on those at-will cases, to support a covenant not to compete. That's not the case. That's not the case. In this court's own opinion in Life Tech, there's a passage that says, where restrictive covenants are ancillary to valid contracts supported by adequate consideration and are reasonable in their terms as to time and territory, such covenants will be enforced by the courts, and relief by injunction is customary and proper. All the cases I've looked at, all the line of Supreme Court cases, don't involve covenants not to compete where the doctors had had some special consideration specifically for the non-compete. The non-competes are ancillary. They're a set of mutual promises and obligations, and we've got a very nice chart in the reply brief at page four that lays out actual, all the promises and considerations that went into the 2009 contract in comparison to the 2001. They are substantial. They are different. Under Corbin's analysis and the courts that rely on Corbin, they don't have to be that much different at all, just not exactly the same. Some change, but here we're well beyond some change. We're into an enormous amount of changes, all negotiated with Dr. Hayden and accepted by Dr. Hayden. You used the cap on corporate expenses as an example of something that you negotiated a bargain for. Did that exist before 2009, or was it not a matter of concern because you were dealing with grocery seeds? The latter. It didn't exist because the formula had been, and it was. So what cap was your client suggesting? It was actually. Or no cap. It was a 2009 contract. And it was 15? Fifteen percent. Later, when the question was, when the point was made up that they continued to talk, Dr. Hayden came back and he said, I want to make sure that I get at least a guaranteed minimum bonus for the year. And they talked to him about that. Again, they wanted to keep him happy. As it turned out, and there's a very good chart again in the primary brief that we submitted that identifies the difference in pay that Dr. Hayden made in 2009 versus what he would have made to the day he quit in 2001. And guess what? He comes out ahead substantially under the new 2009 formula when you add base and you add the bonus that he was paid. On the one hand, in 2009 is the time he quit. He had $193,000 between base and bonus. That doesn't include the $67,000 that was the added consideration for signing the 2009 contract. $193,000 versus, and this is testimony unrefuted in the record, versus $137,000 what he would have earned under the 2001 contract. Now, the lower court's only response to that was that, well, we don't know how the fourth quarter is going to come out. So it might be, in the end, less. I suppose if there was a catastrophe within the IEC and they shut their doors, that might be true. Unlikely. I'm sorry, your time is up. Thank you.